IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS JOHNSON, | ) | |
| | ) | |
| PLAINTIFF, | ) | (WO - For Publication) |
| | ) | |
| v. | ) | CASE NO.  2:04-cv-117-F |
| | ) | |
| DEWAYNE WRIGHT, *et al.,* | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION AND ORDER

In February of 2004, Plaintiff Thomas Johnson brought this suit against a variety of law enforcement officers, a law enforcement volunteer, and the entities for which they worked.  Plaintiff was arrested outside a bar in Clanton, Alabama in May of 2002.  He contends that he was arrested without probable cause and that the force used to effectuate his arrest was excessive.  He also contends that he was beaten and subjected to illegal treatment after being transported to the Chilton County Jail that night.  This Court has previously ruled on certain motions dismissing some of the defendants from this action.  This Memorandum Opinion and Order addresses the motions for summary judgment the remaining defendants have filed.

Specifically, this cause is before the Court on the following motions: (a) Officer Dewayne Wright's Motion for Summary Judgment (Doc. # 87) filed on April 19, 2005; (b) Samuel Ogilvie's Motion for Summary Judgment (Doc. # 84) filed on April 19, 2005; (c) the Motion for Summary Judgment filed on April 12, 2005 by Defendants Kevin Driver, Stephen

Brock, Robert Bland, and Nick Baker (Doc. # 76), and (d) Defendants' Mark Bass and

Robert Monroe's [sic] Motion for Summary Judgment (Doc. # 120) filed on June 6, 2005.

Because these motions raise many of the same issues, the Court will address these motions

together in this Memorandum Opinion and Order.  For the sake of clarity and brevity, each

defendant will be referred to in this Memorandum Opinion and Order by his surname.

Thomas Johnson will be referred to as Plaintiff or Johnson.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action pursuant to

28 U.S.C. §§ 1331, 1343(a)(3) & (4)**,** and 1367.  No challenge is made to the personal

jurisdiction over the parties or the appropriateness of venue; both of which are supported by

the facts of this case.

## STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears

the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

Some of the Defendants in this case have urged this Court to grant summary judgment on certain grounds because Plaintiff failed to address those grounds in his brief in opposition to the their summary judgment motions. For example, Brock, Bland, Baker and Driver contend that they are entitled to summary judgment on all claims brought by Plaintiff other

than his Fourth Amendment claim for excessive force and state law claims for assault and battery because he abandoned such claims by failing to address them in his opposition to their motions for summary judgment. *See* Doc. # 117. While it would make this Court's job considerably easier if it could grant summary judgment on every claim that a party fails to address in opposing a motion for summary judgment, the law of this Circuit does not allow this Court to take such an approach. *See, e.g., Trustees of Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Employers v. Wolf Crane Serv., Inc.,* 374 F.3d 1035, 1039-40 (11th Cir. 2004); *United States v. One Piece of Property, 5800 S.W. 4th Ave., Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004). This Court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion, nor can this Court deem a claim abandoned by a plaintiff absent some affirmative indication that he no longer wishes to pursue that claim. *Id.*

## PROCEDURAL HISTORY

On February 11, 2004, Johnson filed suit against the City of Clanton, Wright, Ogilvie[1], the Chilton County Commission, Brock, Bland, Baker, Driver, Bass, Monroe, and some fictitious defendants. On April 26, 2004, Johnson filed his Amended Complaint (Doc. # 30). The Amended Complaint names the same defendants as the Complaint except that it

---

[1] Ogilvie is the proper spelling of this defendant's surname. The Complaint and the Amended Complaint identified this defendant as Olgivie. Counsel for this defendant has used both spellings in submissions. It was not until reviewing the deposition testimony submitted in conjunction with the instant motions that the Court was able to ascertain the proper spelling of this name. The Court will refer to this Defendant as Ogilvie.

does not contain any allegations against any fictitious defendants.

The Amended Complaint sets forth several claims.  Several of the claims allege violations of Plaintiff's rights under the United States Constitution.  These claims are brought pursuant to 42 U.S.C. § 1983.  The constitutional violations alleged are: a violation of the Fourth Amendment prohibition on the use of excessive force (Count One);[2] a violation of the Fourth Amendment prohibition on unreasonable seizures (Count Two); and a Fourth Amendment violation of the prohibition on arrest without a warrant or probable cause (Count Three).  In addition to these claims under federal law, the Amended Complaint also contains several claims pursuant to Alabama law: assault (Count Four); battery (Count Five); negligence (Count Six); and false arrest/false imprisonment (Count Seven).  Plaintiff seeks a declaration that the practices complained of are unlawful and in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; compensatory damages of $1,000,000; punitive damages of $5,000,000; attorneys' fees and costs; and all other relief the Court deems just and proper.

By prior orders of this Court, all claims against Bass, the City of Clanton, and the Chilton County Commission have been dismissed.  Additionally, the sole claims against Wright and Ogilvie pursuant to 42 U.S.C. § 1983 arise from alleged violations of Plaintiff's Fourth Amendment rights to be free from the use of excessive force and from unlawful

---

[2]  Although the heading on Count One refers only to the Fourth Amendment, the actual allegations of this count also allege violations of rights under the Fifth and Fourteenth Amendments. Am. Compl. at ¶ 35.

arrest.  All defendants remaining in this action at this time are sued only in their individual capacities and are not sued in their official capacities.

## FACTS

It is well-settled that in reviewing the merits of motions for summary judgment, this Court must view the facts in the light most favorable to the non-moving party.  In this case, that party is the plaintiff.  Additionally, this Court may not make credibility determinations or resolve factual disputes.  Only in the absence of genuine issues of material facts may defendants, such as the movants in this case, establish that they are entitled to judgment as a matter of law.  The Court has carefully reviewed the numerous depositions, affidavits, and other documents submitted in support of and in opposition to the pending motions.  In this Court's review, the record is replete with disputes over what occurred.

On the night of Saturday, May 25, 2002, Johnson and his wife went to the Skylight Bar because Johnson's wife wanted to go dancing.[3]  After less than fifteen minutes in the bar, Johnson and his wife decided to leave because they didn't care for the band that evening. There is undisputed testimony before this Court that before leaving, Johnson used the bathroom in the bar.  Johnson and his wife then spoke briefly with the manager who refunded the cover charge they had paid.  Johnson did not consume any alcohol while in the Skylight Bar.  Johnson and his wife walked hand in hand to their parked car.  When they were getting into the vehicle a police car pulled up right behind their car.

---

[3]  Because Johnson had consumed some beer that evening, his wife drove.

6

The police car which pulled up behind the Johnsons' car contained Wright, then a police officer for the City of Clanton[4], and Ogilvie, a member of a volunteer ride-along program called the Explorer Program.[5]  According to Wright, he was just driving through the parking lot on a routine patrol when he saw Johnson urinating in the parking lot.[6]  Johnson

_____

[4] According to the undisputed evidence before this Court, Wright's employment with the City of Clanton police department terminated after the events giving rise to this lawsuit due to incidents unrelated to the events giving rise to this lawsuit.  Wright is currently employed as a police officer in Selma, Alabama.

[5] The City of Clanton operates a program called the Explorer Program.  This is a volunteer program by which civilian volunteers can ride along with the police.  The Explorer Program in the City of Clanton is affiliated with the Boy Scouts of America; however, not all participants in the Explorer Program were members of the Boy Scouts of America.  Indeed, Ogilvie was not a member of the Boy Scouts of America.  Rather, Ogilvie was simply a person with a interest in becoming a police officer.  He received a letter concerning the Explorer Program and went to an informational meeting about the program.  After this meeting he signed up for the program in 1997 or 1998.  After signing up for the Explorer Program, Ogilvie participated in the program for a number of years.  During his participation in the program, he wore a uniform provided to him by the City of Clanton Police Department.  The pants to this uniform were the same as those worn by the police officers for the City of Clanton.  The shirt for this uniform was of a similar style and color, but it had different cloth patches on the sleeve and had a cloth badge on the chest which had the word "Explorer" in place of the metal police badge worn by officers.  The City of Clanton does not pay participants in the Explorer Program.  During Ogilvie's participation in the program, he helped chaperone a DARE program dance and he helped direct traffic for parking at high school football games.  He also rode along with City of Clanton police officers on patrol numerous times and sometimes assisted the officers with whom he was riding with arrests.

[6] It is clear from Wright's testimony that he could see only Johnson's back and that he believed he say liquid hitting the ground in front of Johnson.  Wright testified that as Johnson turned around Wright saw Johnson's penis as he was zipping up his pants.  Ogilvie only saw the puddle near where Johnson had been standing and Johnson zipping up his pants as he turned around.

and his wife testified that Johnson did not urinate in the parking lot[7] and attribute the puddle

of liquid near Johnson's feet to fluids leaking from his vehicle.

The events which occurred after Wright saw Johnson next to his vehicle are very

much in dispute.[8] It is undisputed that Wright first addressed Johnson from the police cruiser

through the cruiser's open window. Wright asked Johnson what he was doing and asked if

he had urinated in the parking lot. Johnson replied that he was not doing anything.[9] After

this initial exchange, Wright got out of his police car and approached Johnson. Ogilvie

followed. According to some witnesses, Johnson was neither loud or disrespectful to Wright.

According to Wright, Johnson was both loud and disrespectful and approached Wright with

clenched fists. According to Ogilvie, Johnson seemed to be a mean and aggressive type who

was standing in an aggressive posture. Glenn testified that Wright was yelling and screaming

at Johnson, but that she did not hear Johnson "get loud" in response. Johnson and his wife

testified that Wright was screaming at Johnson and spitting in his face. They contend that

Wright yelled at Johnson like a drill instructor and demanded that he say "Sorry officer sir,

---

[7] According to Johnson's testimony he had just used the bathroom in the bar before walking out to the car.

[8] Before this Court are several descriptions of the events in the parking lot. Johnson and his wife have given sworn testimony about what happened. Wright and Ogilvie have also provided sworn testimony about the events. Finally, the Court has before it the sworn testimony of Jennifer Glenn, the daughter of the Chief of Police for the City of Clanton. Glenn was in the parking lot of the Skylight Bar at the time of the events giving rise to Johnson's claim against Wright and Ogilvie.

[9] Wright's testimony, which is disputed by the testimony of other witnesses, indicates that Johnson's initial response to him was angry, loud, and profane.

8

I'm sorry."  During this exchange, Wright continued to accuse Johnson of urinating in the parking lot and Johnson insisted that he had not done so and pointed out that there were numerous puddles in various places around the parking lot.[10]  Wright accused Johnson of "bowing up" at him and took out his can of mace.  According to Johnson and his wife, when Wright accused him of "bowing up" he addressed Johnson, an African American adult male of nearly forty years of age as "boy."[11]  During this exchange, Wright and Johnson were relatively close to one another on the passenger side of Johnson's car.  Ogilvie was a few feet behind Wright.

Johnson's wife, who works as a 911 operator for Chilton County,[12] came around to the passenger side of the vehicle where Johnson and Wright and Ogilvie were standing.  Johnson's wife knew Wright from her work as a 911 operator.  She addressed Wright by his first name and asked him what was going on.  Johnson's wife held her husband's hand and told him to be quiet and still while Wright was "getting in his face" and "calling him a boy" and otherwise acting in a manner that could be seen as trying to provoke Johnson.  Wright told Johnson's wife that this was none of her business and threatened to arrest her too.

Wright claims that once he saw Johnson's wife and recognized her as working for law enforcement he decided to get away from the situation and let her handle it.  He also

---

[10]  Ogilvie testified that there were wet spots all around the parking lot.

[11]  Wright is Caucasian.

[12]  Chilton County is the county in which the City of Clanton is located.

contends that Johnson was using profanity and called him "several racist remarks."[13]  About this time, Wright got a call over the radio to head to a fight in progress in another part of town.  Wright testified that he intended to leave to respond to the call, but before leaving he told Johnson that it was illegal to urinate in a parking lot and demanded that Johnson indicate that he understand that.  Wright repeated his demand.  Johnson's wife was repeatedly saying she was sorry and that they had not done anything.  Johnson said to Wright "You're going to arrest [Johnson's wife]?  She didn't do nothing."  Wright reacted with what appeared to several witnesses as rage.  Glenn heard Wright shaking the can of mace and saw Wright run toward Johnson[14] demanding "What did you say to me, boy?"  According to some witnesses, Wright told Johnson that he was under arrest.[15]  Johnson, who apparently had started to get into his car when Wright had begun to walk back toward the police car, turned around. Wright sprayed Johnson in the face with mace at least twice and started beating Johnson with a baton.[16]  Johnson grabbed his eyes.  One of the baton blows knocked Johnson off his feet.

[13]  When asked for the specifics regarding the racist remarks, Wright indicated that Johnson called him "a racist white" and used profanity.

[14]  Although the testimony is quite confused, it appears that Wright had begun to walk back to the police car at some point.

[15]  Ogilvie and Wright both testified that Johnson was arrested for public intoxication.

[16]  Wright contends that he sprayed mace on Johnson because Johnson stepped toward Wright like he was going to hit or push Wright after having been told he was under arrest. Wright further contends that he only struck Johnson once with his baton in order to get him on the ground for cuffing after Johnson failed to respond to Wright's command that he get on the ground and appeared to Wright to be swinging at him despite having been sprayed with mace.  This testimony is in conflict with the account of other witnesses.

After Johnson was on the ground, Wright jumped on Johnson and to put handcuffs on him. Ogilvie jumped down on Johnson's back to help cuff him because of Johnson's size. Johnson was not fighting back or struggling with Wright and Ogilvie while they were trying to cuff him, but Wright stated that when Johnson fell to the ground he landed on top of his arm and was not complying with Wright's commands to give him his other arm.  Of course, Wright also testified that often when suspects have been sprayed with mace they don't hear what is said to them.  According to Johnson and his wife, Wright beat him with the baton both before and after he was handcuffed.  Johnson and his wife also testified that Ogilvie beat him with a baton after Johnson was in handcuffs.[17]  Unbeknownst to Wright, Ogilvie had purchase an expandable baton, known as an asp, and had it on his person that night.[18] Ogilvie also carried a radio some handcuffs which he had purchased for use when he rode along with the police.

Johnson began to bleed.  Johnson's wife was crying and begging them to stop.  Glenn ran over and screamed at the officers.  Wright ordered Glenn not to approach.

Wright and Ogilvie picked Johnson up of the ground.  There was a puddle of blood

---

[17]  Ogilvie admits that he and Wright had expandable batons out and ready to use and that Wright hit Johnson at least one time.  Ogilvie denies hitting Johnson with his baton.

[18]  The City of Clanton does not allow its police officers to carry police batons unless they are certified and have adequate training.  Nevertheless, the City of Clanton Police Department's written rules for ride alongs does not contain any prohibition against carrying a baton, nor does it address any training requirements for volunteers carrying batons.  Indeed, Ogilvie testified that he was never told not to carry his retractable steel baton and that to his knowledge it was not a violation of any policy to carry it.

on the pavement where he had been laying.  At some point after Johnson had been taken to the ground, his head had been knocked against the concrete his wife saw blood spewing out of his head wound.  Wright and Ogilvie put Johnson in the back of the police car.  Johnson's wife was crying and Glenn was trying to comfort her.  Johnson's wife approached the police car.  According to Johnson, Ogilvie told Johnson's wife to get out of there or he would arrest her.  Johnson's wife responded by indicating that Ogilvie could not arrest her because he was not a police officer.[19]

Wright and Ogilvie drove Johnson to the Chilton County Jail.  Wright and Ogilvie took Johnson to the booking area.  According to Johnson, the handcuffs which had been placed on him at the Skylight Bar were not removed when he arrived at the booking area.  According to Johnson, Wright and the lady behind the desk were laughing and someone said "What have we got here?"  The lady behind the desk asked what the charges against Johnson were and Wright and Ogilvie looked at each other and responded that they didn't know.  This statement prompted Johnson to ask why he was there.[20]

---

[19]  Ogilvie's account of this is in conflict to some extent with Johnson's account. Ogilvie contends that he told Johnson's wife that the best thing she could do was get to in her car and go home.  According to Ogilvie, Johnson's wife then retorted that Ogilvie was not a police officer.  Ogilvie responded that he was not but that Wright was and that she was being disorderly.

[20]  According to the testimony of some of the defendants, Johnson was loud and profane when he was in the booking area.  They also testified that after being asked to remove his jewelry he angrily threw it on the counter piece by piece.

An officer named Brock[21] took Johnson into another room called the "dress out room" and asked him to remove his shoes.  The stated purpose for taking Johnson into the dress out room was to get him into a jail uniform.  According to Johnson, his hands were still cuffed behind him[22] so he attempted to remove his shoes without using his hands.  As Johnson was doing this, Brock assaulted him by throwing Johnson down and starting to beat him.[23]  Other officers ran into the room and without asking questions began to beat Johnson along with Brock.  One officer held Johnson's legs down.  Another was beating him in his back.  Brock was hitting Johnson and choking him.  Johnson began to bleed on the floor and blood began to come out of his nose.  Some of the officers started banging Johnson's shoes on the ground like they were looking for something in his shoes.  Johnson cannot say with any certainty which officers other than Brock were involved in this beating, but he contends that every law enforcement officer who came into the dress out room was beating him.[24]  In part Johnson attributes his inability to specifically identify officers other than Brock on the fact that he still

---

[21]  Brock is employed by the Chilton County Sheriff's department.  The Court notes that according to defendants' testimony it was another employee of the Chilton County Sheriff's Department, Driver, who took Johnson into the dress out room.

[22]  Defendants dispute this fact.

[23]  According to Driver, when he asked Johnson to remove his shoes, Johnson kicked a shoe at Driver which hit Driver in the leg below his knee and stepped toward Driver in an aggressive manner.  Johnson has specifically denied kicking his shoe at anyone at the Chilton County Jail.

[24]  Johnson does not appear to contend that either Wright or Ogilvie were involved in this beating at the Chilton County Jail.

13

had mace in his eyes.[25]  Based on the testimony from defendants in this case, the following

people were in the dress out room with Johnson: Driver, Bland, Baker, Brock, and Monroe[26].

Of course, these defendants contend that Johnson was disruptive, belligerent and

aggressive and that they used the force necessary to subdue him.  The defendants deny that

Johnson was struck or beaten.  Instead they contend that they were merely trying to restrain

him from further aggressive behavior.  Bland even testified that Johnson did not do anything

that would call for any officer to strike or hit him.

At some point, the officers dragged Johnson out of the room and put him in some type

of harness chair.  According to Johnson he was in handcuffs during the entire time he was

being beaten at the jail and he was still in handcuffs when he was strapped into the harness

chair.  Unidentified officers continued to beat Johnson after he was strapped into the harness

chair.

A law enforcement officer took Johnson to the hospital.  Johnson has no complaints

about this officer.  After being examined at the hospital, Johnson was returned to the Chilton

County Jail where he remained until sometime the next morning.  Prior to being allowed to

---

[25]  Although some of the law enforcement witnesses contend that Johnson was allowed to go outside to wash out his eyes with a garden hose when he arrived at the jail, Johnson contends that it was not until he was taken to the hospital later that he was helped to wash the mace out of his eyes.

[26]  At the time of the incident, Monroe was employed as a detective with the City of Jemison Police Department.  He was at the Chilton County Jail that night on an unrelated matter.  Monroe admits that he participated in restraining Johnson.  Driver, Bland, Brock, and Baker were at the time all employed by the Chilton County Sheriff's Department.  Driver, Bland, and Baker were corrections officers and Brock was an investigator.

leave the jail, Johnson was required to take a breathalyzer test. Johnson's wife picked him up and took him home. Johnson claims a variety of physical and emotional injuries arising from the events of May 25, 2002. Some of these injuries resulted in visible damage to his body which was photographed.

## DISCUSSION

### A.  Untimely Service of Process

Ogilvie and Wright argue that they are entitled to summary judgment because they were not served with summons and complaint in this matter within the time provided by Federal Rule of Civil Procedure 4(m). Earlier in the litigation, Ogilvie and Wright moved for dismissal of all claims against them based on Plaintiff's failure to serve them within 120 days of the filing of the Complaint. This issue is one which can be and should resolved by a motion to dismiss. Accordingly, this Court ruled on the service issue in its Memorandum Opinion and Order addressing the motions to dismiss by Ogilvie and Wright. In so doing, this Court had fully considered the argument made on this issue in the briefs submitted in support of and in opposition to the motions for summary judgment as well as the submissions on the motions to dismiss. It was the ruling of this Court that the failure to timely serve was not an appropriate grounds for dismissal of the claims against these defendants. Moreover, the Court deemed it appropriate to exercise its discretion to extend Plaintiff's time for service. Accordingly, this Court finds the that the motions for summary judgment is due to be DENIED.

**B.  Federal Claims Against Wright and Ogilvie**

**1.  Action Under Color of Law**

42 U.S.C. § 1983 provides a remedy when a person acting under color of state law deprives a plaintiff of a right, privilege, or immunity secured by the Constitution, laws, or treaties of the United States.  *See, e.g.,* 42 U.S.C. § 1983;[27] *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) ("§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred") (internal quotes omitted); *Cummings v. DeKalb County*, 24 F.3d 1349, 1355 (11ᵗʰ Cir. 1994).

Thus, to employ § 1983 to secure a remedy for a deprivation of a federally secured right, a plaintiff must generally show that the alleged deprivation was committed by a person acting under color of state law.  *See, e.g., West v. Atkins,* 487 U.S. 42 (1988); *Focus on the Family v. Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1276-77 (11ᵗʰ Cir. 2003). Conversely, purely private conduct is not within the reach of the statute.  *Focus on the Family,* 344 F.3d at 1277.  The "under color of law" requirement of § 1983 has consistently

---

[27]  Section 1983 provides in relevant part:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

been treated as the same thing as the Fourteenth Amendment's state action requirement.

*Focus on the Family,* 344 F.3d at 1276-77 & n.4.  "Section 1983's state action requirement

applies regardless of the nature of the substantive deprivation being alleged."  *Id.* at 1277.

 The Eleventh Circuit has explained that

> The traditional definition of acting under color of state law requires that the defendant in a § 1983 action exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.

*West,* 487 U.S. 42, 49 (1988) (internal quotations omitted).  The Eleventh Circuit Court of

Appeals has employed three distinct tests in determining whether the actions of a private

entity or individual are properly attributed to the state.  The Eleventh Circuit has summarized

these tests as follows:

> Previously, this circuit set forth the three primary tests the Supreme Court has used to determine whether state action exists: (1) the public function test; (2) the state compulsion test; and (3) the nexus joint action test.  The public function test limits state action to instances where private actors are performing functions "traditionally the exclusive prerogative of the state."  The state compulsion test limits state action to instances where the government "has coerced or at least significantly encouraged the action alleged to violate the Constitution." The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise."  We must determine on a case-by-case basis whether sufficient state action is present from a non-state actor (defendant) to sustain a section 1983 claim.

*Focus on the Family,* 344 F.3d at 1277 (quoting *Willis v. University Health Servs., Inc.,* 993

F.2d 837, 840 (11th Cir. 1993).

Ogilvie argues that he cannot be subject to liability under 42 U.S.C. § 1983 because he is not a "state actor."[28]  In his initial motion for summary judgment, Ogilvie seemed to argue that membership in the Boy Scouts of America does not make Ogilvie a state actor for purposes of § 1983.  In support of this argument, he invokes several cases which held that the Boy Scouts of America and its members are not state actors for purposes of liability under § 1983.  This argument is a bit bizarre because Ogilvie admitted in his deposition that he was not a member of the Boy Scouts of America.  It is true that he was a participant in the Explorer Program and that the Boy Scouts of America had some involvement in assisting in the coordination of that program for the City of Clanton Police Department, but Johnson has never predicated his contention that Ogilvie could be liable under § 1983 on an argument that Ogilvie was a member of the Boy Scouts of America.  Moreover, the Court finds that the cases on which Ogilvie relies cannot support a contention that the fact that Boy Scouts of America are involved in a program means that the participants in the program can never be state actors for purposes of § 1983 with any consideration of what the participants were doing in the program.

Not surprisingly, in opposition to Ogilvie's motion for summary judgment, Johnson contends that it was Ogilvie's actions which make him a state actor, not his mere participation in a program to which the Boy Scouts of America has some connection.  This

---

[28] All other remaining defendants appear to concede that they were acting under color of law as they were performing their duties as law enforcement officers for either Chilton County, the City of Clanton or the City of Jemison.

contention is consistent with the allegations against Ogilvie in the Amended Complaint.[29]
The specific actions that Johnson cites are: that Ogilvie was issued a uniform with a cloth
badge which he wore; that Ogilvie went on "ride alongs" with police officers; that Ogilvie
carried a concealed baton; that Ogilvie had previously handcuffed arrestees and participated
in the use of force during arrests; that Johnson participated in the arrest of Johnson.
Moreover, Johnson notes that the Explorer program is administered by the City of Clanton
Police Department which held meetings for participants in the program, including meetings
at which training was provided.   The City of Clanton Police Department reviewed
participants in the program and specifically authorized them to ride along with police
officers.   The Court also notes that Ogilvie threatened to arrest Johnson's wife and while he
later admitted that he could not do so the threat itself shows an attempt to exercise police
power.   The City of Clanton Police Department promulgated rules for Explorers to follow
while on ride alongs with police officers.   These rules mandate that Explorers will carry
handcuffs.

     It is important to note that the City of Clanton Police Department had specifically

---

[29] Specifically, the Amended Complaint alleges that Ogilvie was "duly appointed and
acting as [a] Police Officer for the City of Clanton" and as such was acting under color of
law by enforcing the laws of Alabama. Am. Compl. at ¶ 14.   The Amended Complaint
further alleges that Ogilvie was an agent or employee of the City of Clanton, Alabama and
was acting in the course and scope of his agency or employment.   *Id.* at ¶ 15.   It is further
alleged that immediately before beating Plaintiff, Ogilvie had been riding in a police car.   *Id.*
at ¶ 22.   It is alleged that Ogilvie beat Plaintiff with a nightstick after Plaintiff was placed in
handcuffs and told he was under arrest.   *Id.* at ¶ 24.   Finally, it is alleged that Ogilvie
participated in arresting Plaintiff and transporting him to the jail after his arrest.   *Id.* at ¶ 26.

authorized Ogilvie to wear an official Explorer uniform, to ride in police vehicles on patrol with regular officers for the City of Clanton Police Department and to assist in arrests and perform other police functions.  Moreover, it is undisputed that Ogilvie came to be involved in the events leading to the allegations against him solely because of his participation in a ride along on the evening of May 25, 2002 and his direct and active participation in the arrest of Johnson.  Thus, Ogilvie was a willful participant in joint action with the City of Clanton Police Department and Wright, an on-duty officer of the City of Clanton Police Department. Accordingly, sufficient evidence exists that, if credited, would establish that Ogilvie engaged in conduct for which he may be subjected to liability under § 1983.  This finding precludes the entry of summary judgment in Ogilvie's favor on all claims against him pursuant to § 1983 to the extent that his motion is premised on a contention that he was not acting under color of state law.

### 2.  Plaintiff's Claims that Ogilvie and Wright violated the Fourth Amendment

At this juncture in the case, Johnson has only two claims against Ogilvie and Wright pursuant to 42 U.S.C. § 1983.  Those claims challenge the propriety of Johnson's arrest and the allegedly excessive nature of the force used to effectuate that arrest.[30]  Both types of claims are cognizable violations of Fourth Amendment rights.

---

[30]  In the motions for summary judgment filed by Ogilvie and Wright they reiterate a number of the arguments from their motion to dismiss which attack the sufficiency of the allegations of the federal claims against them in the Amended Complaint.  The Court has fully addressed these arguments in its ruling on the motions to dismiss and will not repeat itself in this Memorandum Opinion and Order.

### a. Excessive Force

All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *See, e.g., Graham v. Connor,* 490 U.S. 385, 395 (1989).  Whether the force is reasonable hinges on the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.*  The "calculus of reasonableness" must embody allowance for the fact that police officers are often forced to make split-second judgments in tense, uncertain, and rapidly changing situations. *Id.* at 396-97.

The Eleventh Circuit Court of Appeals has interpreted the Supreme Court's language in *Graham* as requiring the balancing of three factors in determining whether the force applied was reasonable. *Draper v. Reynolds,* 369 F.3d 1270, 1277-78 (11th Cir. 2004). These factors are the need for the application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted. *Id.*  The application of *de minimus* force, without more, will not violate the Fourth Amendment's prohibition against the use of excessive force. *See, e.g., Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir. 2000).

Viewing the facts before this Court in the light most favorable to Plaintiff, all the

*Graham* factors weigh in favor of Plaintiff.  The facts viewed in the light most favorable to Plaintiff show that Johnson was doing nothing more than attempting to enter his vehicle in the parking lot of a bar when he was confronted by Wright and Ogilvie.  Wright verbal abused Johnson and threatened to arrest him.  Wright also yelled at Johnson's wife and threatened to arrest her.  All the while, Johnson insisted that he and his wife had not done anything and could not be arrested.  Wright yelled that Johnson was under arrest.  When Johnson simply inquired about the nature of the charges, Wright sprayed Johnson with mace, struck him with a baton causing Johnson to fall onto the parking lot, and beat Johnson even after he had been handcuffed.  Ogilvie participated in striking Johnson with a baton several times after he was handcuffed.  Ogilvie and Wright caused Johnson's head to be slammed into the paved parking lot.  This blow to the head resulted in a wound that bled.  There is nothing in these facts, if credited by the jury, that would support the inference that Johnson posed a significant threat to the safety of himself, Wright, Ogilvie or others.  Examining the application of the Eleventh Circuit's articulation of the *Graham* factors to the instant case, it is not apparent from the evidence before the Court that Wright and Ogilvie necessarily needed to apply the degree of force allegedly used .  Because the weighing of the relevant factors balances in favor of Johnson, the Court finds that Johnson has stated a claim pursuant to 42 U.S.C. § 1983 arising out of the use of excessive force in violation of the Fourth Amendment and offered sufficient evidence in support of that claim to preclude the entry of summary judgment for Ogilvie and Wright.

22

**b.  False Arrest/Unreasonable Seizure**

False arrest claims under § 1983 are analyzed solely as unreasonable seizure claims under the Fourth Amendment and not as claims for deprivation of due process under the Fourteenth Amendment.  *See, e.g., Albright v. Oliver,* 510 U.S. 266, 274 (1994); *Hamm v. Powell,* 893 F.2d 293, 294 (11th Cir. 1990).  "A warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim."  *Marx v. Gumbinner,* 905 F.2d 1503, 1505 (11th Cir. 1990).  Where probable cause for an arrest exists, however, no false arrest claim pursuant to section 1983 is viable.  *Id.* at 1505-06.

> Probable cause [to arrest] exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.  Probable cause does not require overwhelmingly convincing evidence, but only reasonably trustworthy information, and probable cause must be judged not with clinical detachment but with a common sense view to the realities of normal life.  When the facts are not in dispute, whether probable cause existed is a question of law.

*Id.* at 1506 (internal citations and quotations omitted).

If the facts are viewed in the light most favorable to Johnson, a reasonable jury could find that Wright and Ogilvie arrested Johnson without a warrant and without probable cause.  Accordingly, the Court finds that Plaintiff has stated a claim pursuant 42 U.S.C. § 1983 for alleged violations of his rights under the Fourth Amendment to be free from unlawful arrest and unreasonable seizure and properly supported it with sufficient evidence to defeat the motions for summary judgment filed by Wright and Ogilvie.

23

Thus, this Court finds that there is evidence before this Court which, if credited, could support Johnson's contentions that these rights were violated. For this reason, the Court is satisfied that Johnson has established that he was deprived of rights actually secured by the United States Constitution. While Ogilvie argues that the force he used to assist in effectuating the arrest was not excessive, his contention is predicated on a version of facts which ignores facts favorable to Johnson. Similarly, Ogilvie argues that he did not arrest or seize Johnson and could not have done so. Again, this argument is predicated on facts in dispute. When the facts are viewed in the light most favorable to Johnson, the Court finds sufficient evidence from which a reasonable jury could find that Ogilvie seized or arrested Johnson without probable cause. Given the procedural posture of the case, this Court cannot agree with Ogilvie that he is entitled to summary judgment because he contends he did not use excessive force and did not arrest or seize Johnson.

### 3.   Qualified Immunity for Ogilvie and Wright

Defendants Ogilvie and Wright argue that the doctrine of qualified immunity bars Plaintiff's claims of excessive force and unlawful arrest. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). *Accord, Hope v. Pelzer*, 536 U.S. 730 (2002). "The purpose of this immunity is to allow government officials to

carry out their discretionary duties without fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).  *See also Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003).

### a.  Discretionary Authority

To receive qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful actions occurred."  *Id*. (internal quotation marks omitted).  Based on the allegations of the case it would appear that Wright and Ogilvie were so acting.

### b.  Constitutional Violation

The next step in the qualified immunity analysis is the determination of whether the plaintiff's allegations, if true, establish a constitutional violation.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.

In the instant case, the Court has already found that Plaintiff's allegations and evidence could support a violation of the Fourth Amendment's prohibition against the use of excessive force or the Fourth Amendment's prohibition against unlawful arrest or

unreasonable seizure. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the rights to be free from the use of excessive force in the course of arrest and the right to be free from arrest without probable cause. In the context of the qualified immunity analysis, the question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer. *Vinyard,* 311 F.3d at 1347. Thus, for the excessive force claim, this Court must ask whether a reasonable law enforcement officer would believe that the level of force used was necessary in the situation at hand. *Id.* Similarly for the unlawful arrest/unreasonable seizure claim, the Court must ask whether a reasonable law enforcement officer would have believed he had arguable probable cause to arrest.[31]

---

[31] Qualified immunity applies when there was arguable probable cause for an arrest even if actual probable cause did not exist. *Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry."). Hence, "[i]n the context of a wrongful arrest claim, an officer will be protected by qualified immunity if he had arguable probable cause to effectuate the arrest. *Brown v. Head*, 228 F. Supp. 2d 1324, 1328 (M.D. Ala. 2002) (internal quotations and citation omitted). Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could – not necessarily would – have believed that probable cause was present. *Durruthy v. Pastor,* 351 F.3d 1080, 1089 (11th Cir. 2003) ("Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." ) (internal marks and citation omitted); *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed."); *Brown*, 228 F. Supp. 2d at 1328 ("Arguable probable cause exists when reasonable police officers, in the same circumstances and possessing the same knowledge as the Defendant, could have believed that there was probable cause to make a warrantless arrest.") (citation omitted). This inquiry is objective as the Court must ask whether the officer's actions were

Viewing the facts in a light most favorable to Plaintiff, Wright and Ogilvie did not have arguable probable cause to arrest Plaintiff. Plaintiff has produced evidence from which a reasonable jury could find that he did not engage in the conduct for which he was arrested. Although Wright and Ogilvie have produced evidence to the contrary, this Court would be exceeding its authority if it rendered a decision at this stage of the litigation on the credibility and veracity of the conflicting evidence. Because Plaintiff has established a violation of his Fourth Amendment rights, based on his version of the facts, the Court will now move to the second step of the qualified immunity inquiry.

Because the alleged conduct violated constitutional rights, the next step of the inquiry is to determine whether the rights at issue were "clearly established." *Vinyard,* 311 F.3d at 1349. As the Eleventh Circuit Court of Appeals put it, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" *Vinyard*, 311 F.3d at 1346 (quoting *Saucier,* 533 U.S. at 201). In so doing, a court must do more than just compare the facts of the instant case to prior cases to determine if a right is clearly established; it must also assess whether the facts of the instant case fall within statements of general principle found in appropriate precedent. *See, e.g., Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates law even in novel factual circumstances. Indeed, in *[United States v.]*

objectively reasonable regardless of the officer's underlying motivation or intent. *Montoute*, 114 F.3d at 183.

27

*Lanier* [, 520 U.S. 259 (1997)], we expressly rejected a requirement that previous cases be 'fundamentally similar.'"); *Holloman,* 370 F.3d at 1278; *Vinyard,* 311 F.3d at 1351.  Indeed, the "salient question... is whether the state of the law...gave [the officers] *fair warning* that their alleged treatment [of the plaintiff] was unconstitutional."  *Hope,* 536 U.S. at 741.

Officials sued pursuant to § 1983 have a right to fair notice.  *Id.* at 739.  This notice can be given in three ways.  *Vinyard*, 311 F.3d at 1350-53.  First, the words of the federal statute or constitutional provision may in themselves be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law.  *Id.* at 1350.  Second, preexisting case law may serve to provide fair notice.  *Id.* at 1351.  Case law need not arise out of factually identical situations to clearly establish law for purposes of the qualified immunity analysis.  *Id.* at 1351.  Broad legal principles established in case law may serve to clearly establish the law even for cases arising out of factually different situations.  *Id.*  Third, in the absence of case law with a broad holding sufficient to provide fair notice, fact specific precedents may serve to clearly establish the law arising out of materially similar factual circumstances.  *Id.* at 1351-52.

The Eleventh Circuit has previously found in some cases that the Fourth Amendment itself is sufficiently clearly to establish that certain conduct violates the protections of that provision.  Specifically, it has observed that in the Fourth Amendment context, it has sometimes found violations of the Fourth Amendment in excessive force cases involving

28

conduct "far beyond the hazy border between excessive and acceptable force" even in the absence of prior case law.  *Vinyard*, 311 F.3d at 1350 n.18.

Cases in which the language of the Fourth Amendment itself has been sufficient to put the officer on notice that his conduct  was in violation of the law appear to be cases involving the use of significant force after an arrestee has been subdued.  *Id.*  For example, beating a suspect, kicking a suspect, or slamming the head of a suspect the ground is conduct which deprives the law enforcement officers of qualified immunity when the suspect was handcuffed and did not struggle or resist the officers in any way and did not attempt to flee.  *Slicker v. Jackson,* 215 F.3d 1225, 1232-33 (11th Cir. 2000).

Similarly, there can be no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment.  *See, e.g., Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990).  Indeed, the Eleventh Circuit has repeatedly held that this legal tenant is "clearly established" for purposes of addressing qualified immunity claims by public officials.  *See, e.g., Id.*; *Herren v. Bowyer*, 850 F.2d 1543, 1547 (11th Cir. 1988).  *See also Babers v. City of Tallasee*, 152 F. Supp. 2d 1298, 1304 (M.D. Ala. 2001).

In light of the foregoing, the Court is persuaded that Wright and Ogilvie had fair warning that the conduct in which they were allegedly engaged violated the Fourth Amendment's prohibitions on excessive force and arrest without probable cause.  Moreover, the Court finds that genuine issues of material fact preclude summary judgment in favor of Wright and Ogilvie on the basis of qualified immunity.  Accordingly, the motions for

29

summary judgment by Wright and Ogilvie are due to be DENIED to the extent that they are based on qualified immunity.

### 4. 42 U.S.C. § 1988

Moreover, the motions for summary judgment by Wright and Ogilvie both include arguments that Plaintiff's claims pursuant to 42 U.S.C. § 1988 must fail because Plaintiff has no viable claims pursuant to 42 U.S.C. § 1983.  Obviously, given this Court's ruling that there exist triable issues on Plaintiff's claims pursuant to 42 U.S.C. § 1983, there can be no summary judgment granted on Plaintiff's claims pursuant to 42 U.S.C. § 1988.

## C.  Federal Claims Against Driver, Brock, Bland, Baker, and Monroe

### 1.  Official Capacity Claims

Although it appears to this Court that the Amended Complaint brings only claims against the named defendants in their individual, and not their official capacities, the defendants have had some concern about the existence of official capacity claims in this action.  At the pretrial conference held on July 12, 2005, all parties agreed that the only remaining claims in this action are claims against the named defendants in their individual capacities and that there are no official capacity claims in this action.  Accordingly, the motion for summary judgment by Driver, Brock, Bland, and Baker on claims against them in their official capacities is due to be DENIED as MOOT.

### 2.  Individual Capacity Claims

According to Plaintiff's testimony, Driver, Brock, Bland, Baker, and Monroe

30

participated in beating him in the dress out room of the Chilton County Jail.  This beating occurred after Plaintiff had been arrested and transported to the Chilton County Jail by Wright and Ogilvie and during the time he was being processed.  In fact, the beating took place when Plaintiff was taken into the dress out room to change out of his clothes.  It is undisputed that Driver, Brock, Bland, Baker, and Monroe[32] were in the dress out room and attempting to subdue Plaintiff.  Plaintiff contends that all of the law enforcement officers in the dress out room beat him while he was handcuff.  Plaintiff further contends that this beating was unprovoked.  Driver, Brock, Bland, Baker, and Monroe have disputed Plaintiff's account of the events in the dress out room.

### a.  Fourth Amendment False Arrest/Unlawful Seizure Claim

Driver, Brock, Bland, Baker, and Monroe contend that they are entitled to summary judgment on Plaintiff's claims that his Fourth Amendment rights to be free from false arrest and unlawful seizure because they did not participate in his arrest and seizure at the Skylight Bar.  Plaintiff has not created any genuine issue as to any fact material to this particular argument.  Indeed, Plaintiff has not addressed this argument in any of his submissions in opposition to summary judgment.  Nevertheless, this Court must ascertain whether on the undisputed facts, Driver, Brock, Bland, Baker, and Monroe are entitled to judgment as a

---

[32] Monroe was present at the Chilton County Jail on May 26, 2005, after having taken a suspect into custody during a drug related offense.  At that time, Monroe, who is sued only in his individual capacity, was acting in his capacity as a detective for the City of Jemison Police Department.

matter of law on these claims.  Because a requisite element of such claims is an arrest or seizure and Plaintiff cannot show that any of these defendants participated in his arrest or seizure, the Court agrees that they are entitled to judgment as a matter of law.  Accordingly, the motions for summary judgment by Driver, Brock, Bland, Baker, and Monroe are due to be GRANTED to the extent that they seek summary judgment on Plaintiff's claims against them in their individual capacities pursuant to 42 U.S.C. § 1983 for alleged violations of Plaintiff's Fourth Amendment rights to be free from unreasonable seizures or arrest without probable cause.

### b.  Fourth Amendment - Excessive Force Claim

Plaintiff's claims against Driver, Brock, Bland, Baker, and Monroe for what he contends was a beating in the dress out room of the Chilton County Jail are properly analyzed as claims of excessive force in violation of Plaintiff's rights under the Fourth Amendment to the United States Constitution. *See, e.g., Calhoun v. Thomas,* 360 F. Supp. 2d 1264 (M.D. Ala. 2005) (Thompson, J.).  Driver, Brock, Bland, Baker, and Monroe all contend that qualified immunity shields them from liability for this claim.  Plaintiff disagrees.

As previously explained, the doctrine of qualified immunity insulates government agents from personal liability for money damages in certain circumstances.  The test for qualified immunity hinges on whether the officials' conduct was objectively reasonable in light of established law.  The first step in the qualified immunity inquiry is a showing by the defendant official that he was acting within the scope of his authority and performing his

32

employment duties.  This step is easily established in this case.  Indeed, Plaintiff does not take issue with the contention that Driver, Brock, Bland, Baker, and Monroe were acting within the scope of their discretionary authority at the time of the alleged application of force.  Thus, the Court will now address whether Plaintiff has adequately show a violation of a constitutional right that was clearly established at the time of the incident.

In analyzing an excessive force claim, the Court must evaluate whether the defendants' actions were objectively reasonable in light of the totality of the circumstances confronting the defendants, without regard to their underlying intent or motivation.  *Graham,* 490 U.S. at 396.  As outlined earlier in this Memorandum Opinion and Order, the Court must perform a reasonableness calculus looking to the circumstances under which the force was applied, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1279 (11th Cir. 2004).

The claim here is that Driver, Brock, Bland, Baker, and Monroe beat Plaintiff while he was handcuffed and in an interior room in the Chilton County Jail.  A reasonable jury could find that this beating occurred after Plaintiff did nothing more innocuous than attempting to remove his shoe upon being directed to do so.  Of course, the Court is mindful that these facts are hotly disputed by these defendants.  Nevertheless, the Court cannot weigh the evidence at this stage in the litigation, nor can it engage in credibility determinations.

33

When the facts are viewed in the light most favorable to Plaintiff, the non-movant, this Court must conclude that the conduct at issue easily rises to the level of a violation of Plaintiff's clearly established constitutional right to be free from the application of excessive force. Accordingly, Driver, Brock, Bland, Baker, and Monroe are not entitled to summary judgment on the basis of qualified immunity, nor are they entitled to summary judgment on the basis of a contention that the evidence does not support a finding that Plaintiff has established a violation of his Fourth Amendment rights. Accordingly, the motions for summary judgment of Driver, Brock, Bland, Baker, and Monroe are due to be DENIED to the extent that they are based on such arguments.

**E. State Law Claims[33] Against Wright and Ogilvie**

**1. Immunity under the Volunteer Service Act**

Ogilvie contends that is immune from Plaintiff's Alabama law claims under the Volunteer Service Act and seeks summary judgment on such claims against him on the basis of this immunity. Alabama has enacted a Volunteer Service Act which provides for immunity to volunteers in some circumstances. *See* Ala. Code § 6-5-336 (1975). Pursuant

---

[33] Ogilvie and Wright argue that this Court should decline to exercise supplemental jurisdiction over the claims against them pursuant to Alabama law. This Court has considered the factors relevant to the determination of whether it should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and finds it is appropriate for it to exercise its discretion to hear all the claims together in one action. Accordingly, to the extent that their motions for summary judgment are predicated on a contention that this Court should decline to exercise supplemental jurisdiction over the state law claims, the motion are DENIED.

to the Volunteer Service Act,

> Any volunteer shall be immune from civil liability in any action
> on the basis of any act or omission of a volunteer resulting in
> damage or injury if: (1) the volunteer was acting in good faith
> and within the scope of such volunteer's official functions and
> duties for a nonprofit organization, a nonprofit corporation,
> hospital, or a government entity; and (2) the damage or injury
> caused was not caused by willful or wanton misconduct by such
> volunteer.

Ala. Code § 6-5-336(d) (1975).  The Volunteer Services Act defines "volunteer" as "[a]

person performing services for a nonprofit organization, a nonprofit corporation, a hospital,

or a government entity without compensation, other than reimbursement for actual expenses

incurred."  Ala. Code § 6-5-336(c)(4) (1975).  For purposes of this statute, a governmental

entity includes a municipality such as the City of Clanton.  Ala. Code § 6-5-336(c)(1) (1975).

        Given the procedural posture of this case, this Court must refrain from resolving

factual disputes and must view the evidence in the light most favorable to Plaintiff.  When

the facts and the reasonable inferences which can be drawn from them are viewed in the light

most favorable to Johnson, this Court cannot find that Ogilvie is entitled to the protection of

the Volunteer Services Act.  The immunity provided to volunteers pursuant to the Volunteer

Services Act is limited to good faith actions and cases in which the damage or injury was not

caused by willful or wanton misconduct by the volunteer.  While the evidence regarding this

issue is in dispute, the evidence viewed in the light most favorable to Plaintiff establishes

evidence from which a reasonable jury could find that Ogilvie's conduct was outside of the

protections of the Volunteer Services Act.  Accordingly, to the extent that Ogilvie seeks

summary judgment on the basis of the immunity provided by the Volunteer Services Act, his

motion is DENIED.

**2. Discretionary function immunity for Wright and Ogilvie**

Wright and Ogilvie asserts that, pursuant to the discretionary function or state-agent

immunity provided by *Ala. Code* § 6-5-338 (1975),[34] they are entitled to prevail on Plaintiff's

state law claims.  The Alabama legislature has granted statutory immunity from tort liability

to municipal police officers for "conduct in performance of any discretionary function within

the line and scope of his or her law enforcement duties."  *Ala. Code* § 6-5-338(a) (1975).

Such immunity shields a state agent from suit in his or her personal capacity for claims based

upon "exercising judgment in the enforcement of the criminal laws of this State, including

---

[34]  Section 6-5-338 provides in pertinent part as follows:

(a) Every peace officer, except constables, who is employed or appointed
pursuant to the Constitution or statutes of this state, whether appointed or
employed as such peace officer by the state or a county or municipality thereof,
or by an agency or institution, corporate or otherwise, created pursuant to the
Constitution or laws of this state and authorized by the Constitution or laws to
appoint or employ police officers or other peace officers, and whose duties
prescribed by law, or by the lawful terms of their employment or appointment,
include the enforcement of, or the investigation and reporting of violations of,
the criminal laws of this state, and who is empowered by the laws of this state
to execute warrants, to arrest and to take into custody persons who violate, or
who are lawfully charged by warrant, indictment, or other lawful process, with
violations of, the criminal laws of this state, shall at all times be deemed to be
officers of this state, and as such shall have immunity from tort liability arising
out of his or her conduct in performance of any discretionary function within
the line and scope of his or her law enforcement duties.

*Ala. Code* § 6-5-338 (1975).

36

but not limited to, law-enforcement officers' arresting or attempting to arrest persons(.)" *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).[35]   No immunity is available, however, "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."   *Id*.   Therefore, state-agent immunity shields Wright and Ogilvie[36] from tort liability except to the extent that their treatment of Plaintiff could reasonably be said to have been willful or malicious conduct or conduct engaged in bad faith.[37]

Under the circumstances in this case, the Court believes that a jury could reasonably determine that the treatment Plaintiff received at the hands of Wright and Ogilvie was willful, malicious and in bad faith.   *See, e.g., Wright v. Wynn,* 682 So. 2d 1, 2 (Ala. 1996); *Franklin v. City of Huntsville,* 670 So. 2d 848, 853 (Ala. 1995).   The evidence, viewed most favorably to Plaintiff, suggests that Ogilvie and Wright had no grounds to believe Plaintiff

---

[35]   The Alabama Supreme Court has recently refined its standard for entitlement to discretionary function immunity, otherwise known as state-agent or state-function immunity. In *Ex parte Butts,* 775 So. 2d 173 (Ala. 2000), the court adopted as its position the "restatement" of the law of state-agent immunity that was advanced by a plurality in *Ex parte Cranman,* 792 So.2d 392 (Ala. 2000).

[36]   The Court will assume *arguendo* that Ogilvie could claim this immunity.   The Court notes, however, that there is no authority for his claim of entitlement to this immunity.

[37]   This Court is mindful that qualified immunity under federal law and state-agent immunity under Alabama law are not identical; federal immunity employs an objective, reasonable-officer standard, while state immunity is a subjective inquiry into what the defendant officers actually believed. *See Scarbrough v. Myles,* 245 F.3d 1299, 1303 n.9 (11th Cir. 2001) (contrasting standards for award of immunity).   Consequently, a federal court's finding that defendants are entitled to qualified immunity as to federal claims does not always compel the conclusion that the defendants are entitled to Alabama state-agent immunity.

had committed any offense whatsoever, but rather simply did not like Plaintiff questioning their authority, disagreeing with them about the source of the liquid in the puddle in the parking lot, or verbalizing criticism towards them.  Consequently, the subsequent arrest of Plaintiff was unjustified and supports an inference of action with malice.  Plaintiff has offered evidence from which a reasonable jury could find that Wright and Ogilvie used excessive and unreasonable force against Plaintiff in the course of Plaintiff's arrest.  On this evidence, the Court cannot find, as a matter of law, that the conduct of Wright and Ogilvie was not malicious or taken in bad faith.  Accordingly, the Court must find, at this stage, that neither Wright nor Ogilvie are entitled to state-agent immunity in relation to Johnson's claims.  Accordingly, to the extent that the motions for summary judgment filed by Wright and Ogilvie are predicated on discretionary function immunity, they are due to be DENIED.

### 3.  Assault and Battery Claims Against Wright and Ogilvie

Count Four and Count Five of the Amended Complaint set forth claims pursuant to Alabama law for assault and battery.  These claims are predicated on the allegations that Wright and Ogilvie beat Plaintiff while he was handcuffed and slammed his head onto the parking lot.

In support of their motions for summary judgment, Ogilvie and Wright argue that they did not commit the torts of battery or assault.  Specifically they argue that to establish these claims Plaintiff must show that Wright and Ogilvie acted unlawfully and that Plaintiff cannot do so.  Once again genuine issues of material fact preclude judgment as a matter of law in

38

favor of Wright and Ogilvie.  Under Alabama law, a plaintiff seeking to recover for the tort of assault must show an intentional unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.  *See, e.g., Wood v. Cowart Enters., Inc.,* 809 So. 2d 835, 837 (Ala. Civ. App. 2001).  With regard to battery, a plaintiff must establish that the defendant touched him, that the touching was intentional, and the touching was conducted in a harmful or offensive manner.  *See, e.g., Ex parte Atmore Cmty. Hosp.,* 719 So. 2d 1190, 1993 (Ala. 1998).  When the evidence is viewed in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find in Plaintiff's favor on these two state law claims.  Accordingly, the motions of Ogilvie and Wright are due to be DENIED to the extent that they seek summary judgment on the claims of assault and battery.

### 4.  False Arrest and False Imprisonment Claims Against Wright and Ogilvie

Count Seven of the Amended Complaint sets forth a claim pursuant to Alabama law for "false arrest/false imprisonment."  This claim is predicated on Plaintiff's allegation that Ogilvie and Wright "detained [him], prohibited him from leaving, circumscribed his physical liberty, ordered him and compelled him to go from place to place without a warrant and with neither reasonable suspicion nor probable cause to do so."  Am. Compl. at ¶ 60.  Plaintiff further alleges that he was falsely arrested and imprisoned.  Am. Compl. at ¶¶ 61-62.

In support of their motions for summary judgment, Ogilvie and Wright argue that they

did not commit the torts of false arrest or false imprisonment.  Specifically they argue that

to establish these claims Plaintiff must show that Wright and Ogilvie acted unlawfully and

that Plaintiff cannot do so.  Plaintiff has explicitly stated that he has abandoned any state law

claim for false arrest.  (Doc. # 116 at p. 19).  Given that the false arrest claim and the false

imprisonment claim were articulated in the same count as one claim and that Plaintiff has

made no response whatsoever in opposition to the motions for summary judgment by Ogilvie

and Wright on the false imprisonment claim, the Court understands Plaintiff's statement to

include not only his false arrest claim, but also his false imprisonment claim.  Accordingly,

the motions for summary judgment by Wright and Ogilvie are due to be GRANTED to the

extent that they seek judgment in favor of Wright and Ogilvie on all claims set forth in Count

Seven of the Amended Complaint.

**F.  State Law Claims Against Driver, Brock, Bland, and Baker**

Plaintiff has included a number of claims pursuant to Alabama law in the Amended

Complaint.  To the extent that these claims are brought against, Driver, Brock, Bland, and

Baker, they contend that they are immune from suit pursuant to Alabama law under Article

I § 14 of the Alabama Constitution of 1901.  The Court agrees.

Pursuant to Article I, § 14 of the Alabama Constitution of 1901, "the State of Alabama

shall never be made a defendant in any court of law or equity."  *Id.*  In accordance with

Article I § 14's sovereign immunity provisions, courts applying Alabama law have routinely

held that sheriffs and their deputies are executive officers of the State of Alabama who, with

40

a few exceptions, are absolutely immune from suit on state law claims. *See, e.g., Tinney v.*

*Shores,* 77 F.3d 378, 383 (11th Cir.1996) ("Under Alabama law, sheriffs and deputy sheriffs,

in their official capacities and individually, are absolutely immune from suit when the action

is, in effect, one against the state.").[38]

The only exceptions to state sovereign immunity for a sheriff or deputy are "actions

brought (1) to compel him to perform his duties, (2) to compel him to perform ministerial

acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting

in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law,

or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a

---

[38]    In surveying Alabama law regarding the outer limits of sovereign immunity for sheriffs, the Eleventh Circuit has observed some confusion in Alabama courts, such that there is "no clear answer" as to whether sovereign immunity protects sheriffs or deputies sued in their individual capacities for malicious or intentional wrongdoing. *See, e.g., McMillian v. Johnson,* 101 F.3d 1363, 1364-65 (11th Cir. 1996) (collecting Alabama cases and noting inconsistencies). However, this Court need not be troubled by such uncertainty, because the *McMillian* court, applying *Tinney,* has adopted an unambiguous interpretation of Alabama law, pursuant to which "a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity," even if that claim is based on malicious or intentional wrongdoing. *McMillian,* 101 F.3d at 1365 (reversing trial court finding that sheriff was not entitled to immunity for individual-capacity claims of malicious prosecution, abuse of process and outrage); *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1430 (11th Cir. 1997) ("Under Alabama law, a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity."); *Adams v. Franklin,* 111 F. Supp. 2d 1255, 1272-73 (M.D. Ala. 2000) (finding that state law claims seeking monetary damages from sheriff and deputies in individual capacities for assault and battery, negligence, intentional infliction of emotional distress, and outrage were barred by sovereign immunity doctrine, pursuant to *Tinney* ). Thus, this Court is subject to a binding interpretation of Alabama law under which sheriffs and their deputies are absolutely immune from state law claims in their individual and official capacities, even if they are sued for actions that are malicious, intentional or otherwise outside the scope of their authority.

41

necessary party for the construction of the statute." *Parker v. Amerson,* 519 So. 2d 442, 443 (Ala. 1987).  These exceptions manifestly do not apply where a sheriff is being sued for money damages, rather than for injunctive relief.  *See Tinney,* 77 F.3d at 383 ("under Article I, § 14, the only exceptions to a sheriff's immunity from suit are actions brought to enjoin the sheriff's conduct," not actions for damages).

It is undisputed that Plaintiff's claims against Driver, Brock, Bland, and Baker pursuant to Alabama law are brought against them individually and in their official capacities as Deputy Sheriffs of Chilton County for their alleged acts and omissions as such.  It is equally clear that the Amended Complaint demands compensatory and punitive damages as well as attorneys' fees and costs.  While the Complaint also includes a request for a declaratory judgment that the policies and practices complained of are unlawful and in violation of the United States Constitution, this declaratory relief relates to Plaintiff's claims pursuant to 42 U.S.C. § 1983 and not his state law claims.  Moreover, it does not bring the claims against these defendants outside of the protections of Article I, § 14.  Furthermore, Plaintiff has not maintained that any of the *Parker* exceptions apply; indeed, he cannot credibly do so, inasmuch as she is plainly suing these defendants for money damages, not injunctive relief.  Accordingly, Driver, Brock, Bland, and Baker are entitled to judgment as a matter of law on all of Plaintiff's claims against them pursuant to Alabama law and their motion for summary judgment on those claims is due to be GRANTED.

**G. State Law Claims Against Monroe**

Monroe seeks summary judgment on Plaintiff's state law claims against him for assault, battery, negligence and false imprisonment on the basis of discretionary function immunity. Genuine issues of material fact preclude judgment as a matter of law on this basis. Additionally, Monroe argues that Plaintiff cannot establish the required elements of a claim of assault under Alabama law. The Court finds that genuine issues of material fact preclude judgment as a matter of law on this basis as well. Accordingly, Monroe's motion for summary judgment is due to be DENIED to the extent that it seeks summary judgment on Plaintiff's claims against him pursuant to Alabama law.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) Officer Dewayne Wright's Motion for Summary Judgment (Doc. # 87) is DENIED in part and GRANTED in part as set forth above.

(2) Samuel Ogilvie's Motion for Summary Judgment (Doc. # 84) is DENIED in part and GRANTED in part as set forth above.

(3) Motion for Summary Judgment filed on April 12, 2005 by Defendants Kevin Driver, Stephen Brock, Robert Bland, and Nick Baker (Doc. # 76) is DENIED in part and GRANTED in part as set forth above.

(4) To the extent that Defendants', Mark Bass and Robert Monroe's [sic] Motion for Summary Judgment (Doc. # 120) seeks summary judgment on behalf of Mark Bass it is

43

DENIED as MOOT.

(5) To the extent that Defendants', Mark Bass and Robert Monroe's [sic] Motion for Summary Judgment (Doc. # 120) seeks summary judgment on behalf of Robert Monroe it is DENIED in part and GRANTED in part as set forth above.

DONE this the 17th day of October, 2005.

_____
            /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE